# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 19-70020

United States Court of Appeals
Fifth Circuit

**FILED**

November 12, 2019

Lyle W. Cayce
Clerk

PATRICK HENRY MURPHY,

Plaintiff - Appellee

v.

BRYAN COLLIER, EXECUTIVE DIRECTOR, TEXAS DEPARTMENT OF
CRIMINAL JUSTICE; LORIE DAVIS, DIRECTOR, TEXAS DEPARTMENT
OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION;
BILLY LEWIS, Warden,

Defendants - Appellants

Appeal from the United States District Court
for the Southern District of Texas

Before DENNIS, ELROD, and HIGGINSON, Circuit Judges.

JAMES L. DENNIS, Circuit Judge:

Five days ago, the Southern District of Texas granted a motion from
Texas death row inmate Patrick Henry Murphy seeking to stay his execution.
Officials of the Texas Department of Criminal Justice (TDCJ) now move in this
court to vacate the district court's order so that Murphy may be executed
tomorrow, November 13, 2019. For the following reasons, the TDCJ's motion
is DENIED.

## I.

Earlier this year, two days before his then-scheduled execution, Texas death row inmate Patrick Henry Murphy, a Buddhist, filed the instant lawsuit under 42 U.S.C. § 1983 and a motion for stay of execution in the Southern District of Texas. He alleged that the State of Texas's execution policy allowing only TDCJ employees in the execution chamber violated the First Amendment and the Religious Land Use and Institutionalized Persons Act (RLUIPA). At the time of Murphy's scheduled execution, all the TDCJ-employed chaplains were Christian and Muslim, and execution protocol did not provide any accommodation for inmates, such as Murphy, who wished for the presence of a spiritual advisor of a different religion in the execution chamber. Under this policy, Murphy alleged that Christian and Muslim death row inmates could have a spiritual advisor of the same religion in the execution chamber with them, while inmates of other religions, like Murphy, could not.

The district court denied Murphy's motion for a stay of execution as untimely. Murphy appealed to this court the day before his scheduled execution, and we affirmed, explaining that "the proper time for raising such claims has long since passed." *Murphy v. Collier*, 919 F.3d 913, 915 (5th Cir. 2019).

The Supreme Court granted Murphy's motion for a stay mere hours before Texas had planned to execute him. Justice Kavanaugh authored a concurrence wherein he "conclude[d] that Murphy made his request to the State in a sufficiently timely manner, one month before the scheduled execution." *Murphy v. Collier*, 139 S. Ct. 1475, 1476 n.* (2019) (Kavanaugh, J., concurring). Justice Kavanaugh also offered "at least two possible equal-treatment remedies available to the State going forward: (1) allow all inmates to have a religious adviser of their religion in the execution room; or (2) allow

inmates to have a religious adviser, including any state-employed chaplain, only in the viewing room, not the execution room." *Id.* at 1475.

## II.

Five days after the Supreme Court's order, the TDCJ revised its execution procedure, implementing the second of Justice Kavanaugh's suggestions; its new policy prohibits the presence of any chaplain or spiritual advisor in the execution chamber. About two weeks after the TDCJ revised its policy, on April 18, 2019, Murphy filed an amended complaint in the district court that incorporated arguments made in his earlier pleadings while adding arguments directed to the changes in the new TDCJ policy. Murphy's amended complaint still alleged violations of the Establishment Clause, Free-Exercise Clause, and RLUIPA, but the focus of the amended complaint shifted to the interaction an inmate has with his spiritual advisor before entering the execution chamber.

The parties conducted discovery for several months, which revealed the following: All inmates have access to their spiritual advisor during regular business hours in the two and a half days leading up to the execution. On the day of the execution, however, access is restricted. An inmate may only meet with a non-TDCJ spiritual advisor in the holding area (generally referred to as the "death house") between 3:00 and 4:00 p.m. on the day of his execution. The inmate may make phone calls, including to his spiritual advisor, until 5:00 p.m. Thereafter, only TDCJ personnel may interact with the inmate. The policy, however, does not place any limitation on visits by TDCJ-employed clergy, who appear to have access to an inmate until the moment he enters the execution chamber.

Murphy argued that the amended policy still favors some religions over others because TDCJ-employed chaplains—who apparently are all Christian or Muslim—have greater access to the condemned than non-TDCJ employee

spiritual advisors.[1] Murphy urged that "the defect Justice Kavanaugh identified in the Supreme Court's March order has simply not been eradicated by [the new TDCJ] policy" because "the disparate treatment of different religions continues to exist in the holding area where a condemned inmate is held in the hours before he is executed."

On July 19, the TDCJ and Murphy filed cross motions for summary judgment. On August 12, before the district court ruled on these motions and while the litigation was ongoing, the state trial court rescheduled Murphy's execution for November 13 at the State's request. On November 4, while awaiting the district court's resolution of the dueling summary-judgment motions, Murphy filed a motion for a stay of execution in the district court.

On November 7, the district court denied both motions for summary judgment and granted Murphy's motion to stay his execution. In a thorough 14-page decision, the district court explained its reasons for granting a stay. The district court explained that, in practice, the TDCJ policy allows chaplains to "provide spiritual support only to inmates of certain faith groups." TDCJ argued in the district court that TDCJ clergy serve a primarily secular role in the execution process, providing comfort and consolation to inmates facing imminent execution. The district court found, however, that TDCJ clergy "may serve as more to inmates of certain faiths." TDCJ clergy indicated that they would pray with Christian inmates during the time before their execution but would not pray with a prisoner of a different faith if doing so did not accord with the chaplain's personal religious faith. The district court concluded that "serious issues remain unresolved about the TDCJ-employed clergy's mission

---

[1] Murphy's amended complaint continued to allege that the absence of his spiritual advisor in the death chamber violated his constitutional rights. We focus, however, on his claim concerning the greater access to a spiritual advisor in the death house by inmates sharing the same faith as TDCJ-employed clergy because that was the focus of the district court's analysis.

4

and how they will carry it out, specifically in relation to inmates not of their faith." The district court also concluded that, at the litigation's current juncture, it was unclear why the State must accomplish its secular purpose of calming and comforting inmates through a chaplain rather than a trained professional "whose position does not carry with it the imprimatur of a specific religion."

The district court also suggested the State's procedure may not be the least restrictive means of accomplishing its goals of maintaining security and the confidentiality of the drug team, its proffered compelling state interest. The court stated that "some alternative arrangement may be possible to preclude interaction between outside clergy and the process of preparing for an execution," such as allowing the condemned inmate to "be held in a location where his spiritual advisor would be unable to view the execution preparations," remedying the State's security concerns.

Ultimately, the district court concluded that "[t]he concerns raised by the amended complaint's focus on the pre-execution procedure are as compelling as those in the original complaint." "If Murphy were Christian, he would have the benefit of faith-specific spiritual support until he entered the execution chamber; as a Buddhist he is denied that benefit." Finding the State's justifications for the disparate treatment wanting based on the discovery thus far, the district court determined that "[a] stay will allow the Court time to explore and resolve serious factual concerns about the balance between Murphy's religious rights and the prison's valid concerns for security."

## III.

The TDCJ appeals, arguing that the district court erred in granting Murphy's motion for a stay. "We review a district court's grant of a stay of

execution for abuse of discretion." *Adams v. Thaler*, 679 F.3d 312, 318 (5th Cir. 2012).

We conclude that the district court did not abuse its discretion in granting Murphy's stay. We agree with the district court's implicit finding that Murphy has a strong likelihood of success on the merits of his claim that the TDCJ policy violates his rights by allowing inmates who share the same faith as TDCJ-employed clergy greater access to a spiritual advisor in the death house.[2]

The TDCJ argues that Murphy's claim is untimely. We made the mistake of agreeing with the TDCJ on this point in March based on Murphy's original complaint, in which he made his request for religious accommodations to the State one month before his scheduled execution and filed his § 1983 suit two days before his execution. The Supreme Court disagreed.[3] Here, the TDCJ's argument is even weaker than before, as Murphy raised his current claim in April, before the State of Texas even scheduled his execution.

---

[2] Though the district court quoted *Nken v. Holder*, 556 U.S. 418, 434 (2009), and issued a 14-page opinion analyzing Murphy's claims, the TDCJ argues—and the dissent agrees—that it is unclear whether the district court applied the proper standard because it did not make an explicit finding that Murphy had a strong likelihood of success on the merits. Our decision in *Adams v. Thaler* forecloses this line of attack. Even if the finding was not explicit, "in granting the stay, the district court made an implicit determination that it was reasonably likely that [Murphy's petition] justified relief from judgment." *Adams v. Thaler*, 679 F.3d 312, 318 (5th Cir. 2012). If the district court's one-page order in *Adams* was detailed enough to find that the petitioner there had a strong likelihood of success on the merits, the district court's 14-page opinion here is sufficient.

The dissent also contends that once Murphy is in the execution room, he may view his spiritual advisor in the witness room and may chant along with him. While the new TDCJ policy allows a spiritual advisor in the witness room, the record does not reveal whether Murphy and his spiritual advisor could "chant" or even communicate through this setup.

[3] While a majority of the Court did not give reasons for granting the stay, the grant contains an implicit finding that Murphy's claim was timely.

The dissent contends[4] that "the Supreme Court's stay has no bearing on whether claims raised *after* that stay grant are timely" because at the time of the Supreme Court's order, Murphy had yet to raise the holding-area claims he brings in his amended complaint. We cannot agree that the Supreme Court's stay has no bearing on this case. In granting the stay of Murphy's execution in March, the Supreme Court ruled implicitly that Murphy's claims were timely. In his concurrence, Justice Kavanaugh made this finding explicit, "conclud[ing] that Murphy made his request to the State in a sufficiently timely manner, *one month before the scheduled execution*." *Murphy*, 139 S. Ct. at 1476 n.* (Kavanaugh, J., concurring) (emphasis added).[5] The Supreme Court's finding that this claim was timely bears directly on the timeliness of Murphy's current claim—if Murphy's request was timely when made a month before his scheduled execution, it is certainly timely when made before his execution was even scheduled.

Of course, "[a] court considering a stay must also apply a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Hill v. McDonough*, 547 U.S. 573, 584 (2006). However, this is not a case where Murphy filed a last-minute claim with his execution date looming. Here, the State of Texas set a new execution date on August 12, 2019, four months after Murphy filed his complaint. Therefore, Murphy brought his claim "at such a time as to allow consideration of the merits without requiring entry of a stay." *Id.* It is the State of Texas that required entry of a stay by seeking an execution date while the parties were in the midst of litigation in

---

[4] Because of the time-sensitive nature of this matter, we do not address every point raised by our dissenting colleague.

[5] Justice Kavanaugh also authored a separate statement, joined by Chief Justice Roberts, elaborating on his conclusion that Murphy's claim was timely. *See Murphy*, 139 S. Ct. at 1476-78 (statement of Kavanaugh, J.).

the district court and before the district court had adequate time to resolve the claim.

The TDCJ also argues that the district court abused its discretion in granting the stay because Murphy's claims are unexhausted and therefore unlikely to succeed. Again, the Supreme Court implicitly rejected this argument in March. At every stage of the March 2019 proceedings, the TDCJ argued that Murphy's claims were unexhausted. The Supreme Court could not have permitted Murphy's case to proceed if it accepted the TDCJ's exhaustion argument. Because the Supreme Court has already rejected this argument, we reject it as well.[6]

## IV.

The district court conducted a thorough examination of this case and found that a stay was warranted. We find no error or abuse of discretion in its analysis and agree that it should be allowed time "to explore and resolve serious factual concerns about the balance between Murphy's religious rights and the prison's valid concerns for security." Murphy has a strong likelihood of success on the merits of his claim. Taking strong direction from the Supreme Court's earlier decision staying Murphy's execution, we decline to rush this

---

[6] The dissent also contends that Murphy has not shown a likelihood of success on the merits because he fails to persuasively explain why his claims are not barred by the statute of limitations. The TDCJ contends that a two-year limitations period applies to Murphy's claim and that it accrues on "the date direct review of an individual case is complete or the date on which the challenged protocol was adopted." *See Walker v. Epps*, 550 F.3d 407, 414-15 (5th Cir. 2008). The district court found it had inadequate factual development and briefing on this issue to evaluate the TDCJ's argument, "particularly with regard to the pre-execution access to spiritual advisors." It is the TDCJ's burden to establish that Murphy's claim is barred by the statute of limitations. *See F.T.C. v. Nat'l Bus. Consultants, Inc.*, 376 F.3d 317, 322 (5th Cir. 2004). The district court declined to rule on this ground because the TDCJ failed to sufficiently develop its claim; we should as well. Moreover, we note that at the time direct review of Murphy's case was complete, it was impossible for him to know which spiritual advisors would be employed by TDCJ at the time of his execution.

significant inquiry. For the foregoing reasons, IT IS ORDERED that appellants' motion to vacate the stay of execution is DENIED.

JENNIFER WALKER ELROD, Circuit Judge, dissenting:

Because I believe Murphy did not demonstrate that he is likely to succeed on his brand-new, untimely, and unexhausted claim regarding the TDCJ's pre-execution holding-area protocol, I would hold that the district court abused its discretion in granting Murphy's motion for stay of execution. I would therefore grant TDCJ's motion to vacate the stay.

The basis of this brand-new claim is Murphy's access to his spiritual advisor during the time he is in the pre-execution holding area. It is undisputed that on the day of execution, Murphy may visit with his spiritual advisor, as well as family and friends, in the morning. Murphy again has in-person access to his spiritual advisor from 3:00 p.m. to 4:00 p.m. After this time, he has access to his spiritual advisor via telephone until 5:00 p.m. After 5:00 p.m., he is not allowed access to his spiritual advisor until he enters the execution chamber—which is normally at 6:00 p.m.—at which time he may view his spiritual advisor and may chant along with him.[1] The issue in this case, then, boils down to a single hour.

## I.

In 2000, while serving a 55-year sentence for aggravated sexual assault, Murphy and six other inmates escaped from a Texas state prison. *Murphy v. Davis*, 737 F. App'x 693, 695 (5th Cir. 2018). Roughly two weeks later, during the robbery of a sporting goods store, the group killed police officer Aubrey Hawkins when he arrived on the scene. *Id.* at 696–97. The escapees shot Hawkins multiple times and drove over him after dragging him from his vehicle. *Id.* Six of the seven were eventually captured, convicted of capital

---

[1] Undisputed record evidence shows that persons standing in the front of the viewing chamber are visible from the execution chamber through a large, clear window. Thus, Murphy and his spiritual advisor may both engage in their one-word chant in each others' view.

murder, and sentenced to death. *Id.* at 697. Murphy, too, was charged with capital murder, convicted, and sentenced to death. *Murphy v. State*, No. AP-74,851, 2006 WL 1096924, at *1 (Tex. Crim. App. Apr. 26, 2006). His direct appeal and state habeas application failed. *Ex parte Murphy*, No. WR-63,549-01, 2009 WL 1900369, at *1 (Tex. Crim. App. July 1, 2009). His federal habeas claim failed as well. *Murphy*, 737 F. App'x at 699, 709.

Murphy's execution date was scheduled for March 28, 2019. Two days prior, on March 26, Murphy filed a motion for stay of execution and a complaint against TDCJ pursuant to 42 U.S.C. § 1983. *Murphy v. Collier*, 919 F.3d 913, 914 (5th Cir. 2019). The district court denied the stay because it was untimely, and we affirmed. *Id.* at 915–16.

On March 28, 2019, the day Murphy was to be executed, the Supreme Court stayed his execution. *Murphy v. Collier*, 139 S. Ct. 1475, 1475 (2019). In a brief order, the Court stated that Texas could not carry out Murphy's execution unless it permitted Murphy's Buddhist spiritual advisor or another Buddhist reverend to accompany Murphy in the execution chamber during the execution. *Id.* Justice Kavanaugh wrote separately to explain that Texas could remedy the issue either by allowing all inmates to have a religious advisor of their religion in the execution chamber or by allowing all inmates to have a religious advisor only in the viewing room and not in the execution chamber. *Id.* at 1475–76 (Kavanaugh, J., concurring). Justice Alito, joined by Justices Thomas and Gorsuch, dissented from the stay grant on the basis that Murphy "egregiously delayed in raising his claims."[2] *Id.* at 1485 (Alito, J., dissenting).

Following the Supreme Court's opinion, Texas revised its execution procedure to permit only TDCJ-employed security personnel inside the

---

[2] In response, Justice Kavanaugh, this time joined by the Chief Justice, wrote separately a second time to discuss his conclusion that Murphy's claims were timely raised. *Murphy*, 139 S. Ct. at 1476–78 (statement of Kavanaugh, J.).

execution chamber. Subsequent to that change, Murphy amended his complaint to challenge TDCJ's pre-execution holding-area policy, which he argues still favors Christians and Muslims by giving TDCJ chaplains greater access to the condemned in the holding area prior to an execution.

The district court granted Murphy's motion for stay of execution. TDCJ appeals and moves to vacate the stay. For the reasons that follow, I would grant the motion.

## II.

"[T]he courts of appeals shall have jurisdiction of appeals from . . . [i]nterlocutory orders of the district courts of the United States . . . granting, continuing, modifying, refusing, or dissolving injunctions." 28 U.S.C. § 1292(a)(1). "Because a capital defendant's request for a stay is a request for the district court to enjoin the defendant's execution," we have jurisdiction over this appeal. *Howard v. Dretke*, 157 F. App'x 667, 670 (5th Cir. 2005) (unpublished); *see also Mines v. Dretke*, 118 F. App'x 806, 812 (5th Cir. 2004) (unpublished) ("[The plaintiff's] request for a stay is, at its core, a request for the district court to enjoin [the plaintiff's] execution indefinitely. This court has jurisdiction to review any decision by the district court to grant, continue, modify, refuse or dissolve an injunction.").

## III.

"We review a district court's grant of a stay of execution for abuse of discretion." *Adams v. Thaler*, 679 F.3d 312, 318 (5th Cir. 2012).

### A. Execution-Chamber Policy

The district court properly determined that TDCJ has "resolved" the execution-chamber concerns which led to the Supreme Court's stay. ECF No. 57 at 9. Murphy recognizes as much and does not present any substantive argument on appeal that a stay of execution is appropriate on the basis of his execution-chamber claims. His reference to these claims in the analysis section

of his brief is limited to a footnote wherein he asserts his belief that he "will likely ultimately prevail on all of his claims." Accordingly, there is no need to address the execution-chamber policy further.[3]

## B. Pre-Execution Holding-Area Policy

On appeal, Murphy states that his new "Establishment Clause claim . . . pertaining to disparate treatment during the time before an inmate enters the execution chamber . . . is the one the district court found to be compelling." That claim centers on the allegation that in-person visits with outside spiritual advisors in the holding area must terminate by 4:00 p.m. on the day of the execution, whereas TDCJ employees—including Christian and Muslim chaplains—"have access to an inmate until the minute he enters the execution chamber." ECF No. 22 at 13. Murphy argues that this violates the Establishment Clause.[4]

To merit a stay of execution, an applicant bears the burden of showing, among other things, that he "has made a strong showing that he is likely to succeed on the merits," among other factors. *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). "A court considering a stay must also apply 'a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay.'" *Hill*, 547 U.S. at 584 (quoting *Nelson v. Campbell*, 541 U.S. 637, 650 (2004)); *see also Gomez v. U.S. Dist. Court for N. Dist. of Cal.*, 503 U.S. 653, 654 (1992) ("A court

---

[3] Amicus raises issues related to Murphy's execution-chamber claims. Like the majority, we cabin our analysis to the issues addressed by the district court and the parties.

[4] Although amicus addresses Murphy's RLUIPA claims, Murphy himself provides no substantive argument that a stay of execution is merited on the basis of his RLUIPA claims. His substantive argument is strictly limited to "the merits of [his] Establishment Clause claim . . . pertaining to disparate treatment during the time before an inmate enters the execution chamber."

may consider the last-minute nature of an application to stay execution in deciding whether to grant equitable relief."). Moreover, under the Prison Litigation Reform Act of 1995 (PLRA), prisoners challenging prison conditions "must now exhaust administrative remedies even where the relief sought . . . cannot be granted by the administrative process." *Woodford v. Ngo*, 548 U.S. 81, 85 (2006); *Nelson v. Campbell*, 541 U.S. 637, 643–50 (2004) (finding that "method-of-execution challenges" are subject to the PLRA exhaustion requirement).

In his initial complaint, filed on March 26, 2019, Murphy did not challenge TDCJ's holding-area policy. Nor did he previously alert TDCJ that he had any issue with the holding-area policy. And on his own admission, he has never initiated any formal grievance procedure as to any of his religious accommodation claims.

For the first time in his amended complaint, filed April 18, 2019, Murphy claimed that the TDCJ policy "continues to prefer certain religions over others by giving Christian (and perhaps also Muslim) inmates greater access to religious clerics of their faith" while in the pre-execution holding area. ECF No. 22 at 12. The district court granted Murphy's application for a stay on that basis, finding that "[t]he concerns raised by the amended complaint's focus on the pre-execution procedure are as compelling as those in the original complaint." ECF No. 57 at 13.

However, it is unclear whether the district court opinion analyzed Murphy's application under *Nken*. *See* 556 U.S. at 434. Although the district court opinion quotes *Nken*, it never expressly finds that Murphy "has made a strong showing that he is likely to succeed on the merits," *Nken*, 556 U.S. at 434. The district court opinion only states that "serious issues remain unresolved" in Murphy's case, that Murphy has offered "valid concerns," that "the facts are thin" and "[t]he record is not clear yet" as to certain key issues.

ECF No. 57 at 10–13. Murphy responds that, under this court's decision in *Adams v. Thaler*, 679 F.3d 312 (5th Cir. 2012), this court must simply assume that "the district court made an implicit determination" that he was likely to succeed on the merits. *Id.* at 318. Even if the court was to make such an assumption, however: "in order to assess whether the district court properly exercised its discretion in granting a stay, we determine whether [the applicant] has shown a likelihood of success on the merits." *Id.* at 318–19. Here, I would determine that Murphy has not shown a likelihood of success on the merits.

First, and preliminarily, Murphy has not demonstrated a likelihood of success on the merits because his new holding-area claim is untimely. The TDCJ policy clearly states that spiritual advisor "visits shall occur between 3:00 and 4:00 p.m.," which should have made it abundantly clear to Murphy that he would not have physical access to his spiritual advisor after 4:00 p.m. on his execution date. Even if, as he argued in his last appeal, Murphy did not receive the text of the policy until March 5, 2019, *see Murphy*, 919 F.3d at 915–16, an unacceptable delay nevertheless occurred before he filed his amended complaint on April 18, 2019.

Murphy argues that the Supreme Court's grant of a stay of execution in his previous appeal conclusively shows that his holding-area claim is timely. The district court appears to have agreed, remarking in a passing footnote that "the defendants argue that Murphy has not litigated with diligence, although the Supreme Court's earlier stay in this case suggests otherwise." ECF No. 57 at 5 n.1. Murphy also argues that he only delayed bringing his holding-area claim because TDCJ did not change its policy until April 2, 2019. Both of these approaches miss the mark. Even if the Supreme Court's grant of a stay of execution—and fractured opinions respecting that stay—were taken as an implicit conclusion that Murphy's *then-existing* claims were timely, Murphy

15

was not pressing any holding-area claims at that time. Thus, the Supreme Court's stay has no bearing on whether claims raised *after* that stay grant are timely. Moreover, although TDCJ changed its execution-chamber policy on April 2, 2019, it did not change its holding-area policy. There is therefore no reason for Murphy to have waited until after TDCJ's April 2 revision to press his holding-area Establishment Clause claim. Because Murphy's holding-area claim "could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay," *Hill*, 547 U.S. at 584, I would hold that the district court abused its discretion in granting the stay.

Second, and also preliminarily, Murphy has not demonstrated a likelihood of success on the merits because his new holding-area claim is also unexhausted. Murphy acknowledges the "mandatory" nature of the exhaustion requirement for prison litigation, but again argues that the Supreme Court's grant of his stay application should be read as a conclusion that his holding-area claim has been exhausted despite his failure to engage in TDCJ's grievance process. As a basis for such a conclusion, he points to his late February and early March e-mails to TDCJ's general counsel regarding religious accommodations, asserting that these e-mails "satisfied the purpose of exhaustion doctrine." But even if e-mails could take the place of grievance procedures—and even if the Supreme Court's grant of a stay could be interpreted as an implicit conclusion that Murphy's then-existing claims were exhausted—Murphy overlooks the fact that his e-mails only requested changes to TDCJ's execution-chamber policy. Because Murphy's e-mails did not alert TDCJ officials that he wanted changes to TDCJ's holding-area policy, there is no sense in which those e-mails "satisfied the purpose of exhaustion doctrine."

The district court opinion, perplexingly, acknowledged that "[t]he Supreme Court has not recognized a futility exception to the [PLRA] exhaustion requirement," but nevertheless proceeded to find that Murphy

satisfied the exhaustion rule because "[t]here is no indication in the record that filing a prison grievance for review by a warden and then administrative staff would be productive when they have no ability to change TDCJ execution protocol." ECF No. 57 at 5 n.1. Not only has the Supreme Court not recognized a futility exception to the PLRA's exhaustion requirement, it has affirmatively held that prisoners must "exhaust administrative remedies even where the relief sought . . . cannot be granted by the administrative process." *Woodford*, 548 U.S. at 85. Therefore, regardless of whether the grievance process would or would not have resulted in an accommodation acceptable to Murphy, I would hold that the district court abused its discretion in granting his stay application despite his failure to exhaust his holding-area claim.

Third, Murphy has not demonstrated a likelihood of success on the merits themselves. The standard for determining whether "a prison regulation impinges on inmates' constitutional rights" is whether the regulation "is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). Murphy argues that we should apply strict scrutiny to his Establishment Clause claim, rather than *Turner*. Binding circuit precedent forecloses such an approach. *See Brown v. Collier*, 929 F.3d 218, 232 (2019) (applying the *Turner* test "even where claims are made under the First Amendment" (quoting *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 353 (1987))).

Specifically, under *Turner*, courts are to consider the following factors:

> First, is there a "'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it"? Second, are there "alternative means of exercising the right that remain open to prison inmates"? Third, what "impact" will "accommodation of the asserted constitutional right . . . have on guards and other inmates, and on the allocation of prison resources generally"? And, fourth, are "ready alternatives" for furthering the governmental interest available?

*Beard v. Banks*, 548 U.S. 521, 529 (2006) (quoting *Turner*, 482 U.S. at 89–90). Again, the district court opinion inexplicably fails to actually apply these factors to Murphy's new Establishment Clause claim. I therefore analyze Murphy's claim on a blank slate.

Here, TDCJ has offered a legitimate governmental interest—security—that is rationally related to its holding-area policy. As TDCJ explains, execution days are frenetic. Record evidence discusses how executions often prompt the arrival of a throng of media members, demonstrators, counter-demonstrators, and various persons related to the condemned and the victim, sometimes numbering in the hundreds. ECF No. 39-10. In addition to the security concerns caused by the crowds, the entrance of spiritual advisors into the facility poses special concerns. Record evidence also relates incidents where "religious volunteers . . . attempted to bring illicit drugs, alcohol, and other contraband" into the facility. ECF No. 39-19. TDCJ's policy of restricting physical access to inmates to 4:00 p.m. on the day of their execution is rationally related to this interest. *See Murphy*, 139 S. Ct. at 1475 ("[T]here are operational and security issues associated with an execution by lethal injection. Things can go wrong and sometimes do go wrong . . . ."). For the same reasons, an attempt to accommodate Murphy's request to have his outside spiritual advisor physically present with him up until he enters the execution chamber would further tax TDCJ security resources at the time they are already most challenged and further endanger TDCJ personnel.

In addition, Murphy has several avenues for communication with his spiritual advisor available. Undisputed evidence shows that Murphy may visit with his spiritual advisor, as well as family and friends, in the morning of the execution day. ECF 39-2 at 8. Moreover, he again has in-person access to his spiritual advisor from 3:00 p.m. to 4:00 p.m. ECF No. 39-2 at 10. Then, he may speak with his spiritual advisor on the phone until 5:00 p.m. See ECF No.

38-13 at 28, 32–33. Finally, his spiritual advisor may stand in the viewing room while Murphy is in the execution chamber, where he is clearly visible through a large window. ECF No. 39-9 at 3–5. To the extent Murphy desires to have his spiritual advisor's physical presence in the small window of time between 5:00 p.m. and the execution itself, he has not demonstrated that this interest outweighs TDCJ's compelling security interest. And Murphy does not suggest any "ready alternatives" for furthering that compelling security interest, instead simply asserting that TDCJ's security resources are sufficient to accommodate his spiritual advisor's physical presence. This is far from "a strong showing that he is likely to succeed on the merits." *Nken*, 556 U.S. at 434. As a result, I would hold that the district court abused its discretion in granting his application for a stay.[5]

## IV.

In conclusion, I would hold that the district court abused its discretion when it granted a stay of execution. Murphy did not demonstrate that he is likely to succeed on his brand-new, untimely, and unexhausted pre-execution holding-cell claim. I therefore must dissent.

---

[5] Murphy has not shown a likelihood of success on the merits for an additional reason: he fails to persuasively explain why his claims are not barred by the statute of limitations. Claims brought under 42 U.S.C. § 1983 challenging execution procedures are subject to the relevant state personal-injury limitations statute. *See Walker v. Epps*, 550 F.3d 407, 412–14 (5th Cir. 2008). The relevant statute here creates a two-year limitations period, *see* Tex. Civ. Prac. & Rem. Code Ann. § 16.003(a), and the claim accrues on "the date direct review of an individual case is complete or the date on which the challenged protocol was adopted," *Walker*, 550 F.3d at 414–15.